DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON (CABN 217022)
Trial Attorney
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:   (202) 307-6422
Fax:           (202) 307-0054
E-mail:  Amy.T.Matchison@usdoj.gov
             Western.Taxcivil@usdoj.gov

*Counsel for United States of America*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE TAX, LIABILITIES OF: <br><br> JOHN DOES, United States person(s), who directly or indirectly had authority over any combination of accounts held with OX Labs Inc., d/b/a SFOX, SFOX Inc., sfox.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively, "SFOX"), with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016 through December 31, 2021 | Case No. <br><br> **DECLARATION OF SENG TCHONG LEE IN SUPPORT OF EX PARTE PETITION FOR LEAVE TO SERVE "JOHN DOE" SUMMONS** |

I, Seng Tchong Lee, pursuant to 28 U.S.C. § 1746, declare as follows:

1.       I am a duly commissioned Internal Revenue Agent ("Revenue Agent")

assigned as a Senior Revenue Agent in the Internal Revenue Service's ("IRS's") Offshore

Compliance Initiative ("OCI").  OCI develops projects, methodologies, and techniques for identifying United States taxpayers who are involved in abusive transactions and financial arrangements for tax-avoidance purposes.  Although OCI's work typically involves offshore abusive transactions and financial arrangements, the virtual currency issues I have been working on are not limited to offshore activities.

2.     I have been a Revenue Agent since 2006 and have specialized in offshore investigations since 2011.  As a Revenue Agent, I have received training in tax law and audit techniques and have received specialized training in abusive offshore tax issues.  I also have experience investigating offshore tax matters.  I have been assigned to the Virtual Currency Campaign, which addresses tax noncompliance related to the use of virtual currency since October 2019.  My post of duty is in San Francisco, California.

## I.      BACKGROUND

3.     The IRS is conducting an investigation to determine the identity and correct federal income tax liability of U.S. persons who conducted transactions in cryptocurrency for the years ending on December 31, 2016, 2017, 2018, 2019, 2020, and 2021.

4.     As the organization responsible for enforcing and administering the internal revenue laws of the United States, the IRS, in recent years, has become aware of significant tax compliance issues relating to the use of virtual currencies, including cryptocurrencies, as detailed below.

**A.     Tax Compliance Concerns Associated with the Use of Virtual Currencies and the IRS's Compliance Initiative**

5.     In 2013, at the request of the Senate Finance Committee, the Government Accountability Office ("GAO") completed a study of the use of virtual currency. Through interviews with industry representatives, tax professionals, IRS officials, and academics, GAO identified several tax compliance risks associated with virtual currencies, ranging from lack of knowledge of tax requirements and uncertainty over how to report virtual currency transactions to deliberate underreporting of income and tax evasion.  *See* U.S. Gov't Accountability Office, GAO-13-516, *Virtual Economies and Currencies: Additional IRS Guidance Could Reduce Tax Compliance Risks* (May 2013) https://www.gao.gov/products/GAO-13-516 [https://perma.cc/H83E-BFSD].

6.     In September 2016, the Treasury Inspector General for Tax Administration ("TIGTA") issued a report explaining that taxpayers' use of virtual currencies, including cryptocurrencies, had expanded significantly in recent years.  *See* Treasury Inspector General for Tax Administration, Ref. No. 2016-30-083, *As the Use of Virtual Currencies in Taxable Transactions Becomes More Common, Additional Actions Are Needed to Ensure Taxpayer Compliance*, (Sept. 21, 2016) ("TIGTA Report") https://www.treasury.gov/tigta/auditreports/2016reports/201630083fr.pdf [https://perma.cc/5BW9-YXWT].  The report reflects TIGTA's determination that while there are legitimate reasons to use virtual currency – including lower transaction fees and faster transfers of funds compared to traditional currencies – "some virtual currencies are

also popular because the identity of the parties involved is generally anonymous, leading to a greater possibility of their use in illegal transactions." *Id.* at 1.

7.      Since 2005, the IRS's Electronic Payment Systems Initiative ("EPSI") has focused on developing projects, methodologies, and techniques for identifying U.S. taxpayers who use electronic funds transfer and payment systems for tax avoidance purposes.  In September 2013, OCI expanded the scope of the EPSI to address U.S. taxpayers who use virtual currencies for tax avoidance purposes, recognizing that some U.S. taxpayers use such currencies to expatriate and repatriate funds to and from offshore accounts.

8.      In furtherance of the EPSI, the IRS is conducting an investigation to identify tax noncompliance related to the use of virtual currency.  In December 2013, the IRS established a Virtual Currency Issue Team ("VCIT").  The VCIT was established to study the issue and then consider the compliance impact related to virtual currencies.  It developed a three-pronged approach involving first learning about virtual currency, next educating the examination workforce regarding the issue, and then developing examination techniques to identify and address issues during an examination.  This "John Doe" summons is one of the tools being used in the investigation.

9.      In 2015, TIGTA formally initiated a review of the IRS's compliance strategy for addressing the reporting of revenue and expenses occurring through the use of virtual currencies and other alternative payment methods.  The IRS shared information with TIGTA regarding the VCIT and EPSI and advised TIGTA that it was working to further

4

its virtual currency investigation.  In September 2016, TIGTA issued its report and recommended that the IRS develop a coordinated virtual currency strategy, provide updated guidance, and revise third-party information reporting documents.  *See* TIGTA Report at 8-16.  The IRS agreed with TIGTA's recommendations to develop a virtual currency strategy and that additional guidance on documentation requirements and tax treatment would be helpful.

10.    On November 30, 2016, the U.S. District Court for the Northern District of California authorized the IRS to issue a John Doe summons to Coinbase, Inc., a U.S.-based digital currency exchange, to identify U.S. persons who, at any time during the period from January 1, 2013, through December 31, 2015, conducted transactions in a convertible virtual currency as defined in IRS Notice 2014-21.  *See United States v. John Doe*, No. 3:16-cv-06658-JSC, ECF No. 7 (N.D. Cal. Nov. 30, 2016); IRS Notice 2014-21, 2014-16 I.R.B. 938, 2014 WL 1224474 (Mar. 26, 2014), https://www.irs.gov/pub/irs-drop/n-14-21.pdf [https://perma.cc/8AKY-6M2Q].  Coinbase was served with the summons on December 8, 2016 but did not initially comply with the summons.

11.    On March 16, 2017, the government filed a petition to enforce the John Doe summons to Coinbase in the Northern District of California.  On November 29, 2017, the court granted the petition to enforce a narrowed John Doe summons.  *See* Judgment, *United States v. Coinbase, Inc.*, No. 17-cv-01431-JSC, ECF No. 77 (N.D. Cal. Nov. 29, 2017).  Coinbase was ordered to produce documents for accounts with at least the

equivalent of $20,000 in any one transaction type (buy, sell, send, or receive) in any one year for the 2013 through 2015 tax years.  *Id.*

12.     Coinbase advised impacted account holders that it was required to disclose the information described in the enforcement order.  Coinbase stated on its webpage that, "[o]n February 23rd, 2018, Coinbase notified a group of approximately 13,000 customers concerning a summons from the IRS regarding their Coinbase accounts."  Coinbase, https://help.coinbase.com/en/coinbase/taxes-reports-and-financial-services/taxes/irs-notification (Sept. 21, 2020, 4:17 PM) [https://perma.cc/GL68-BSLM].

13.     On July 2, 2018, the IRS announced the Virtual Currency Compliance campaign directed at addressing "noncompliance related to the use of virtual currency through multiple treatment streams including outreach and examinations."  *See* IRS, Press Release, *IRS Announces the Identification and Selection of Five Large Business and International Compliance Campaigns* (July 2, 2018), https://www.irs.gov/businesses/irs-announces-the-identification-and-selection-of-five-large-business-and-international-compliance-campaigns [https://perma.cc/KU4F-VKMQ]; IRS, *Large Business and International Active Campaigns*, IRS.gov, https://www.irs.gov/businesses/corporations/lbi-active-campaigns#virtual-currency [https://perma.cc/G4BZ-8YVV].

14.     Then, on July 26, 2019, the IRS announced that it had begun sending letters to virtual currency owners, advising them to pay back taxes and file amended returns. *See* IRS, Press Release, *IRS Has Begun Sending Letters to Virtual Currency Owners*

*Advising Them to Pay Back Taxes, File Amended Returns; Part of Agency's Larger Efforts* (July 26, 2019), https://www.irs.gov/newsroom/irs-has-begun-sending-letters-to-virtual-currency-owners-advising-them-to-pay-back-taxes-file-amended-returns-part-of-agencys-larger-efforts [https://perma.cc/GV9F-XWG5].  By the end of August 2019, the IRS had sent more than 10,000 letters to taxpayers who owned virtual currency.  Following issuance of the letters, additional taxpayers filed amended returns reporting virtual currency transactions that were not previously reported.

15.     More recently, the IRS has sought and received leave to serve two additional John Doe summonses for cryptocurrency related information.  *See* Order, *United States v. John Does*, No. 21mc91201-RGS, ECF No. 5 (D. Mass. Apr. 1, 2021); Order Granting Narrowed Petition, *United States v. John Does*, No. 21-cv-02201-JCS, ECF No. 9 (N.D. Cal. May 5, 2021).  The first such John Doe summons was issued to Circle Internet Financial, Inc., which offers digital currency exchange services, on April 9, 2021.  The second was issued to Payward Ventures Inc. d/b/a Kraken, a digital currency exchange, on May 11, 2021.  The United States and both summoned parties are in the process of negotiating compliance.

**B.     Cryptocurrency**

16.     Cryptocurrency is a particular type of virtual currency as the IRS has defined that term in Notice 2014-21.  Cryptocurrency can be further divided into two general categories—crypto-coins and crypto-tokens—although the two are often referred to generally as cryptocurrency.

17.     As of January 7, 2022, cryptocurrency tracking website

www.coinmarketcap.com indicated that more than 16,520 separate cryptocurrencies

existed.  The most widely known cryptocurrency, and largest by capitalization, is Bitcoin.

Given Bitcoin's prominence in the cryptocurrency ecosystem, other cryptocurrencies are

often generically referred to as alternative coins or "altcoins" for short.  A few examples

of altcoins are Ethereum ("ether" or "ETH"), Litecoin ("LTC"), Ripple ("XRP"), and

Stellar ("XLM").

18.     In general, cryptocurrency is based on distributed-ledger (blockchain)[1]

technology.[2]  In a distributed ledger technology system, a user creates a cryptocurrency

wallet to engage in cryptocurrency transactions.  A wallet is a computer file that contains

information (software and protocols) used in transferring units of a cryptocurrency.

When the wallet is downloaded or purchased, the user prompts software in the wallet to

generate a private key.  The private key is then used to generate a public key, which, in

---

[1] While distributed ledger technology is commonly referred to as a "blockchain," this is not entirely accurate.  There are some types of distributed ledgers that do not use "blocks."  *See, e.g.*, IOTA, *What Is IOTA,* https://www.iota.org/get-started/what-is-iota [https://perma.cc/PN63-XNKZ] (discussing IOTA distributed ledger's use of a "tangle" chain rather than conventional "block" chain).

[2] *See* Financial Action Task Force Report, *Virtual Currencies Key Definitions and Potential AML/CFT Risks,* (June 2014), http://www.fatf-gafi.org/publications/methodsandtrends/documents/virtual-currency-definitions-aml-cft-risk.html [https://perma.cc/3W7X-R6TD]; *see also generally* Bitcoin, [https://en.bitcoin.it/wiki/Main_Page] [https://perma.cc/DZ44-XBZV].

turn, is used to generate an address.  The private key, public key, and address are linked, but the particular encryption protocols employed to create the public key and address are only one-way, which prevents the reverse engineering of the private key from the address or public key.  *See* Mark, *Blockchain Public Key & Private Key:  A Detailed Guide,* Mycryptopedia (Sept. 22, 2017), https://www.mycryptopedia.com/public-key-private-key-explained/ https://perma.cc/QQE2-PG6F; *see also* David W. Perkins, Cong. Research Serv., No. IF10824, *Financial Innovation: "Cryptocurrencies,"* (Feb. 2018), https://crsreports.congress.gov/product/pdf/IF/IF10824 [https://perma.cc/6JAD-VSM7].

19.    A wallet may hold any number of private/public key pairs.  Addresses and public keys are shared with other users in order to conduct cryptocurrency transactions.  Private keys, which are used as the last piece in forming the digital signature to conduct a transaction, generally are not shared.  Sharing a private key would permit another individual to engage in transactions on the original user's behalf.  *See* Coinbase, *Is a Crypto Address Linked to My Coinbase Account Safe to Display Publicly?,* https://support.coinbase.com/customer/en/portal/articles/2275614-is-a-wallet-address-safe-to-display-publicly-?b_id=13521 [https://perma.cc/N8E7-5NFU].

20.    The method described above for transacting in cryptocurrency is generally the same regardless of whether it is a crypto-coin or crypto-token.  There is a difference, however, in how those two assets are created and how transactions for each are validated and tracked.

21.     Crypto-coins are created as a component of the distributed ledger itself.  As such, when a crypto-coin transaction is entered, it is transmitted to a network of computers, referred to as nodes, which use computer algorithms to confirm the transaction.  Once a transaction is confirmed, that transaction is then recorded in a "block"—one of many linked records of data that make up the distributed ledger's blockchain (assuming the crypto-coin uses a blockchain-type distributed ledger).  *See* Kevin Voigt & Andy Rosen, *What Is Blockchain? The Technology Behind Cryptocurrency, Explained*, NerdWallet (Nov. 4, 2021), https://www.nerdwallet.com/article/investing/blockchain?trk_location=ssrp&trk_query=what%20is%20blockchain&trk_page=1&trk_position=1 [https://perma.cc/3DCF-U5BK].

22.     Generally, all transactions on a crypto-coin blockchain can be viewed by the public on any computer connected to the Internet.[3]  However, the blockchain transactional history generally only reveals the date, time, units, address, wallet ID (to which the address belongs to), and transaction ID associated with a transaction.  The blockchain does not identify the actual identities of the address and wallet owners.

23.     Separately, crypto-tokens are not an inherent part of a distributed ledger. Tokens, rather, are created through particular computer scripts or programs such as smart

---

[3] Not all crypto-coins operate this way.  Some are designed specifically to protect all transactional information or at least to provide users the option to do so.  *See e.g.*, Monero, *What is Monero (XMR)?*, https://web.getmonero.org/get-started/what-is-monero/ [https://perma.cc/46KZ-NDJ4]; Dash, *Features—PrivateSend,* https://docs.dash.org/en/stable/introduction/features.html#privatesend [https://perma.cc/T6X7-5GH4].

contracts or decentralized applications ("DApps") that are hosted or built off of a distributed ledger.  For example, the Ethereum blockchain is a distributed ledger platform that uses the crypto-coin Ether.  *See generally* Ethereum, *Community Guides and Resources*, https://ethereum.org/learn/ [https://perma.cc/MN7S-9ZW8].  The Ethereum blockchain, however, is also designed to host crypto-tokens created through smart contracts or DApps built off of the Ethereum blockchain.  *Id.*  The smart contracts often provide the token owner with ownership of assets.  Thus, while tokens are not currency, they represent other real-world items of value.

24.     As with crypto-coins, crypto-tokens can be transferred using a cryptocurrency wallet.

25.     The peer-to-peer nature of cryptocurrencies, compounded by the pseudo-anonymous nature of the publicly-available-transactional information, makes the examination of an individual's cryptocurrency transactions for tax purposes—particularly, the receipt of income or investment gains—more difficult than examinations involving traditional transactions conducted through regular banking or financial institutions.

26.     In order to buy cryptocurrency (coins or tokens), a user must transfer traditional (fiat) currency to someone who already has cryptocurrency and wishes to exchange it for traditional currency.  This exchange can occur directly with anyone holding cryptocurrency, but also can be handled through businesses known as digital

currency exchanges.  Such businesses trade between cryptocurrencies and traditional currencies or sometimes just between different cryptocurrencies (coins and/or tokens).

27.     A digital currency exchange functions much like a traditional currency exchange, except it deals with the conversion of cryptocurrency for traditional currency or vice versa, as well as the exchange of one cryptocurrency for another cryptocurrency. Digital currency exchanges may also provide wallet services.  These hosted wallet services allow a user to quickly authorize cryptocurrency transactions with another user through a user account held at the exchange.  Hosted wallet accounts are accessible through a computer or mobile device like a smartphone.  *See generally* Edward V. Murphy, et al., Cong. Research Serv., R43339, *Bitcoin: Questions, Answers, and Analysis of Legal Issues* (Dec. 2015).  https://crsreports.congress.gov/product/pdf/R/R43339 [https://perma.cc/V5QH-VFWW].

28.     Another way to trade cryptocurrencies is through the use of over-the-counter ("OTC") brokers.  An OTC broker handles the trading and management of the user's cryptocurrency assets for a fee.  *See* Kevin Kelly*, Bitcoin OTC Brokers: What Are They, How Do They Work, and Should You Use Them, Bitcoin Market Journal* (Aug. 20, 2020)*, https://www.bitcoinmarketjournal.com/bitcoin-otc-brokers/ [https://perma.cc/83MP-NQME].

29.     To avoid the operational hassle and risk of keeping accounts at multiple digital currency exchanges and OTC brokers, users may opt to buy and sell cryptocurrency through a cryptocurrency prime dealer (such as SFOX discussed below).

Such businesses will integrate with multiple digital currency exchanges and OTC brokers and act as the single counterparty for the user.  In other words, the user sells to and buys from the cryptocurrency prime dealer directly.  The cryptocurrency prime dealer functions in a similar way to prime brokers in traditional markets.  *See* SFOX, *What's a Cryptocurrency Prime Brokerage*, (Feb. 7, 2020), https://www.sfox.com/blog/whats-a-cryptocurrency-prime-brokerage/ [https://perma.cc/R222-7FG6].

30.     Cryptocurrency prime dealers are generally regulated as "money transmitters" (a type of money services business) under Title 31 of the United States Code.  *See generally* Financial Crimes Enforcement Network ("FinCEN"), Guidance No. FIN-2013-G001, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013), https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf [https://perma.cc/E9C8-YH3C]; FinCEN Guidance No. FIN-2019-G001, Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies (May 9, 2019), https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf [https://perma.cc/6BVK-AJVP].

31.     As a money transmitter, cryptocurrency prime dealers are required to obtain and maintain certain customer identification information and transactional data for the purpose of combating illicit activity such as money laundering, tax evasion, and terrorism financing.  *See* 31 U.S.C. § 5311; 31 C.F.R. §§ 1010.100(ff)(5), 1022.210; FinCEN

Advisory No. FIN-2019-A003, *Advisory on Illicit Activity Involving Convertible Virtual Currency* (May 9, 2019), https://www.fincen.gov/sites/default/files/advisory/2019-05-10/FinCEN%20Advisory%20CVC%20FINAL%20508.pdf [https://perma.cc/3MCL-5YQ9].

32.     With respect to virtual currencies, cryptocurrency prime dealers (such as SFOX), can provide valuable information about individual customers' cryptocurrency transactions that could be used in conjunction with other publicly available blockchain information to adequately examine whether the customers have complied with internal revenue laws.

33.     As detailed below, the IRS is seeking to issue a John Doe summons to SFOX in order to obtain customer and transactional information belonging to members of the John Doe class that can be used to conduct examinations of persons who may not have complied with the internal revenue laws.

**C.     Taxation of Virtual Currency**

34.     Virtual currency, including cryptocurrency, is treated as property for tax purposes.  *See generally* IRS Notice 2014-21.  The following examples provide an overview of how tax principles applicable to transactions in property apply to transactions in virtual currency:

- Wages, salary, or other income paid to an employee with virtual currency is reportable by the employee as ordinary income and subject to employment taxes paid by the employer.

- Virtual currency received by a self-employed individual in exchange for goods or services is reportable as ordinary income and is subject to self-employment tax.  This would include a person who "mines" virtual currency as a trade or business.

- Virtual currency received in exchange for goods or services by a business is reportable as ordinary income.

- Gain or loss on the exchange of virtual currency for other property is generally reportable as a capital gain if the virtual currency was held as a capital asset and as ordinary income or loss if it is property held for sale to customers in a trade or business. [4]

- Gain on the sale of property held as a capital asset in exchange for virtual currency is reportable as a capital gain.

- Payments made in virtual currency are subject to information reporting requirements to the same extent as payments made in fiat currency or instruments denominated in fiat currency.

*Id.*

35.     Users of cryptocurrency prime dealers, such as SFOX, may engage in

taxable transactions through the receipt of cryptocurrency into their accounts as payment

---

[4] Upon the sale or exchange of virtual currency, a taxpayer must recognize any capital gain or loss on the sale, subject to any limitations on the deductibility of capital losses.  *See* IRS *Frequently Asked Questions on Virtual Currency Transactions*, Q 4, https://www.irs.gov/individuals/international-taxpayers/frequently-asked-questions-on-virtual-currency-transactions [https://perma.cc/3N6B-TYSN].  Capital gains or losses from the disposition of virtual currency must be reported in accordance with IRS forms and instructions, including on Schedule D, Capital Gains and Losses, and Form 8949, Sales and Other Dispositions of Capital Assets.  *See* IRS *Frequently Asked Questions on Virtual Currency Transactions*, Q 43, https://www.irs.gov/individuals/international-taxpayers/frequently-asked-questions-on-virtual-currency-transactions [https://perma.cc/BBZ5-LTB6]; *see also* 26 U.S.C. §§ 1(h); 1211(b); 1222(6)-(7), (10)-(11).  Schedule D and Form 8949 each require taxpayers to report capital gains and losses.  *See generally* Form 8949; Instructions for Form 8949; Schedule D, Instructions for Schedule D.

for goods or services, or through the buying and selling of cryptocurrency through their accounts.

36.    As discussed above, in 2014 the IRS notified taxpayers that virtual currency is treated as property for tax purposes.  *See generally* IRS Notice 2014-21.  Beginning in the 2019 tax year, the IRS updated its Form 1040, U.S. Individual Income Tax Return, to incorporate a question about virtual currency.  On the updated Schedule 1 (Additional Income and Adjustments to Income) the IRS asked, "At any time during 2019, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency?"  For tax year 2020, the question was moved from Schedule 1 to the first page of Form 1040 itself.  This question was added to the Form 1040 to ensure that taxpayers were aware that transacting in virtual currency may have tax implications that should be reported on their tax returns.

**D.    The IRS's Experience with Tax Noncompliance**

37.    As noted above, both GAO and TIGTA have raised concerns about tax compliance issues relating to virtual currency.  And, as discussed above, the IRS has initiated specific programs and campaigns to address compliance issues through both taxpayer education and enforcement.

38.    A taxpayer's gain or loss upon the disposition of virtual currency will generally be the difference between adjusted basis in the virtual currency and the amount received in exchange for the virtual currency, which should be reported on the tax return. *See* 26 U.S.C. § 1001; IRS *Frequently Asked Questions on Virtual Currency*

*Transactions*, *supra*, Q7.  Basis, for virtual currency purposes, is generally determined by the cost or amount spent to acquire cryptocurrency, adjusted for fees, commissions, and other acquisitions costs.  *See* 26 U.S.C. § 1012; IRS *Frequently Asked Questions on Virtual Currency Transactions*, *supra,* Q8.  When reporting gains and losses from the sale of cryptocurrency, a taxpayer may use different methods for calculating that gain or loss.  A taxpayer may use the specific identification method (which pairs the sale of a specific unit of cryptocurrency against a specific acquisition) or the so-called "first-in-first-out" accounting method (which simply pairs the sale of a unit of cryptocurrency against the oldest-acquired unit chronologically).

39.     Although these approaches provide taxpayers with flexibility in how they calculate gains or losses on the sale of cryptocurrency units, they do not allow the IRS to make a "taxable gain" determination by simply reviewing an account holder's transaction information in isolation.  Instead, the IRS must first positively identify an account holder and then determine whether that individual filed a tax return for the relevant tax year, whether that return reported cryptocurrency transactions, and, if so, whether what was reported, or the approach taken in reporting the information, complies with the internal revenue laws.

40.     The IRS has conducted multiple examinations involving taxpayers with transactions occurring at multiple separate cryptocurrency exchanges.  Taxpayers are not required to report on their tax returns the names of the exchanges on which taxable transactions occurred.

41.     One key to determining whether there has been tax compliance is establishing, without question, the identity of the account holder within the IRS's own computer systems.  This means linking a particular account holder to a particular name and taxpayer identification number within the IRS's internal databases.  This is because the IRS cannot begin an examination of a taxpayer without first positively identifying that taxpayer.  To do so, the IRS employs several methods, including matching identifying information from external sources with IRS internal sources and databases.

42.     Basic information such as name, address, date of birth, and taxpayer ID number goes a long way to establish the identity of a taxpayer but, in my experience as a Senior Revenue Agent (particularly working in the offshore and electronic payments systems area), that information is not always enough.  It is not uncommon for taxpayers to use aliases, false addresses or post office boxes, fictitious entity names, or other means to disguise their true identities.  That makes basic information such as name, address, date of birth, and taxpayer ID number insufficient.  Also, that basic information is not always available because certain pieces are sometimes missing (such as date of birth where an entity name is used), incomplete, or have been falsified.

43.     Moreover, some taxpayers deliberately use cryptocurrencies to evade taxes.  Certain taxpayers have openly acknowledged their plans to violate internal revenue laws by intentionally not reporting income from the use of cryptocurrency.  *See* Sean Williams, *36% of Bitcoin Investors Plan to Commit Tax Fraud This Year*, The Motley Fool (Jan. 7, 2018), https://www.fool.com/taxes/2018/01/07/36-of-bitcoin-investors-plan-

to-commit-tax-fraud-t.aspx [https://perma.cc/4K92-R3XJ] (referencing a cryptocurrency user poll conducted by LendEDU); Jeff Gitlen, *Investing in Bitcoin: Survey & Report* (Jan. 15, 2021), https://www.lendedu.com/blog/investing-in-bitcoin [https://perma.cc/4QWZ-AUNM] (detailing user poll results).

44.     Since transactions can be difficult to trace and many cryptocurrencies inherently have a pseudo-anonymous aspect, taxpayers may use them to hide taxable income.  This is illustrated by the actions of the taxpayers described in paragraphs 93 to 102, below.  Each of the taxpayers described in this section held cryptocurrency and conducted transactions through SFOX, that were not reported on their federal income tax returns.

45.     In the IRS's experience, tax noncompliance is more likely to occur when there is no third-party information reporting.  That is, taxpayers are less likely to report and pay taxes on income that is not independently reported to the IRS by a third party such as an employer or financial institution.  IRS "tax gap" studies consistently show that tax compliance is far higher when reported income amounts are subject to information reporting by third parties.  The most recent such study, published on September 26, 2019, based on 2011-2013 data, concluded that the overall rate of underreporting of income that was not subject to third-party information reporting was 55 percent, compared to 5 percent for amounts subject to substantial information reporting but no withholding, and 1 percent for amounts subject to substantial information reporting and withholding.  *See* Barry W. Johnson & Peter J. Rose, IRS Publication No. 1415, *Federal Tax Compliance*

*Research: Tax Gap Estimates for Tax Years 2011-2013*, (Sept. 2019),

http://www.irs.gov/pub/irs-pdf/p1415.pdf [https://perma.cc/2XM5-PDNH].   Where there is no third-party information reporting of cryptocurrency transactions for tax purposes, as is the case with SFOX and other cryptocurrency prime brokers, the likelihood of underreporting is significant.

46.     During the IRS's summons enforcement litigation against Coinbase, the IRS determined that for 2013-2015, only 800 to 900 taxpayers per year filed tax returns with a property description related to Bitcoin or virtual currency despite the fact that Coinbase alone had serviced more than 5.9 million customers and handled more than $6 billion in transactions during that time.  *See United States v. Coinbase, Inc.*, 120 A.F.T.R.2d 2017-6671, 2017 WL 5890052, at *4 (N.D. Cal. Nov. 28, 2017).

47.     The IRS has recently determined that since *Coinbase* the number of taxpayers who file tax returns with a property description related to Bitcoin or virtual currency has increased somewhat.  Using the same parameters as its earlier study, the IRS found that the number of taxpayers who filed a return reporting Bitcoin or virtual currency increased over time: 4,202 taxpayers in 2016, 87,939 in 2017, 94,580 in 2018, and 102,796 in 2019.  While these numbers reflect an increase in reporting, they still fall far short of what would be expected given the number of annual users, transactions, and value that the virtual currency exchanges publicize.

48.     Since Coinbase complied with the John Doe summons, the IRS has continued to reach out to taxpayers regarding their reporting requirements, conduct

examinations, and make referrals to its Criminal Investigation Division.  These compliance efforts are ongoing and remain a priority.  The IRS has also received submissions through its voluntary disclosure practice reporting additional taxes or changes in tax attributes relating to failures to report income from virtual currency transactions.

49.     Since sending more than 10,000 Virtual Currency Compliance campaign letters to taxpayers in July and August 2019, the IRS has received amended returns reporting virtual currency transactions for tax years 2013 through 2019.  As a result of the letters, the IRS has made more than $17.6 million in assessments to date.  These assessments are the result of taxpayers filing amended returns that contain previously unreported virtual currency transactions.  Separately, the IRS has contacted taxpayers who have not filed returns reporting virtual currency by sending them notices related to virtual currency.  Those notices have resulted in more than $92 million in assessments.  The IRS anticipates that such assessments will increase as it continues to pursue civil and criminal investigations.

50.     More recently based on internal and external data available to the IRS, letters were sent to taxpayers who conducted transactions with foreign virtual currency exchanges and may have failed to properly report such transactions and their associated income.

51.     But despite these successes, the IRS has also run into several problems when trying to positively identify Coinbase account holders after Coinbase provided information in response to the IRS's John Doe summons.

52.     The information provided by Coinbase lacked taxpayer ID numbers for approximately 10% of the users (over 1,300 taxpayers).  There were also over 150 instances in which the account data did not include a name and approximately 170 instances where the listed name was a pseudonym.  Further, there were over 500 instances where no date of birth was provided and roughly 1,000 instances where no physical address was provided.

53.     The IRS has worked with Coinbase to attempt to obtain the missing information.  Coinbase was able to provide some of the missing names, missing addresses, and missing dates of birth, but none of the missing taxpayer ID numbers.

54.     During discussions with Coinbase, it explained that some of the account information may be missing because it had not necessarily been collected for some of the oldest accounts.  In these situations, basic identity information such as name, taxpayer ID number, date of birth, and physical address was insufficient to positively identify the actual taxpayer account holder.

55.     The failure in these instances was almost entirely because the account information provided by Coinbase lacked taxpayer ID numbers.  Where there was no taxpayer ID number and other information was also missing, it was nearly impossible for the IRS to positively identify the relevant taxpayer.

56.     Since Coinbase completed its production of information to the IRS in August 2018, the IRS has spent a significant amount of time and resources to identify approximately 535 additional taxpayers from this data, but more than 750 individual Coinbase account holders are still unknown to the IRS.  The IRS continues to work on identifying additional account holders.

57.     The transaction information with respect to the more than 750 still unidentified taxpayers reveals that those taxpayers realized more than $100 million in gross proceeds from the sale of cryptocurrency during the years covered by the Coinbase John Doe summons which the IRS has been unable to link to any identifiable taxpayers.

58.     The court's partial enforcement of the summons in *Coinbase,* which required Coinbase to provide only basic information such as users' names, dates of birth, taxpayer ID numbers, and physical addresses, prevented the IRS from asking Coinbase what additional identifying information its records contained that could help the IRS positively identify the unidentifiable users, such as telephone numbers or email addresses.  Given the relevant statute of limitations, the IRS has been evaluating what options it has to pursue these taxpayers.

59.     As detailed below in paragraphs 93-102, in my experience as a Senior Revenue Agent and supported by further information available to the IRS, the IRS has a reasonable basis for believing there are U.S. taxpayers with accounts at SFOX who are not in compliance with internal revenue laws because they are not correctly reporting

certain items or are simply failing to report any income or tax relating to cryptocurrency transactions.

## II.    SFOX

### A.    Organization and Structure

60.    Ox Labs Inc. ("Ox Labs") is a California corporation incorporated in May 2014.  Its headquarters are at 8939 S. Sepulveda Boulevard, Suite 102, Los Angeles, California, 90045.  *See Ox Labs Inc.*, SEC Edgar Filing Tracker, https://sec.report/CIK/0001750042 [https://perma.cc/LMG4-MG8H].

61.    Ox Labs is the parent company for a subsidiary, SFOX Inc., d/b/a "SFOX," a Texas corporation with its headquarters at 8939 S. Sepulveda Boulevard, Suite 102, Los Angeles, California 90045.  *See SFOX Inc.*, Bloomberg, https://www.bloomberg.com/profile/company/1645614D:US [https://perma.cc/Q9F2-EDLM].

62.    SFOX was founded in 2015 by Akbar Thobhani and George Melika, who are currently the company's developers.  *See About SFOX,* SFOX, https://www.sfox.com/about/ [https://perma.cc/8VFG-XL2K].

63.    SFOX is a cryptocurrency prime dealer and trading platform that connects exchanges, OTC brokers, and liquidity providers globally.  *See id.*  In its blog called *SFOX Edge*, SFOX states that it offers users access to "liquidity for digital assets through a[n] institutional-grade blockchain trading platform [that includes] cross market execution, advanced algorithmic order types, global market data analysis, and blockchain infrastructure support."  SFOX, *Move Over, Mutual Funds: SFOX's Separately Managed*

*Accounts Solution Enables Personalized Crypto Portfolio Management*, (Jan. 16, 2020),

https://www.sfox.com/blog/move-over-mutual-funds-sfoxs-separately-managed-

accounts-solution-enables-personalized-crypto-portfolio-management/

[https://perma.cc/5WBE-D64Z].

64.     According to its Terms of Service agreement, SFOX provides its users

(customers) with the following services:

> Through your SFOX account ("SFOX Account") and the SFOX Site you are
> able to buy and sell cryptocurrency and have access to trading algorithms, in
> addition to certain other services that may be provided by SFOX from time to
> time, including, among other things, account management tools, general news
> and information, trading alerts, market data including price and analytics, and
> educational information (collectively, the "Services").   When using the
> Services to buy or sell cryptocurrency through your SFOX Account, you are
> directly buying from, and directly selling to, SFOX. SFOX does not offer
> exchange or clearance services.  SFOX and its affiliates may transact through
> their own accounts through the Services, for purposes including, but not
> limited to, treasury management and to effect purchases and sales of
> cryptocurrency by SFOX and its affiliates.

SFOX, *Terms of Service* § 1.1 (last updated Nov. 13, 2021), ("SFOX Terms of Service")

https://www.sfox.com/terms/ [https://perma.cc/R94Y-TK3S].

65.     The Terms of Service agreement includes "SFOX, Pte. Ltd.," a Singapore

entity for Singapore residents and "SFOX BVI" for users that do not reside in the United

States or Singapore.  *See id.*  SFOX, Pte. Ltd. was incorporated in Singapore on January

20, 2020.  *SFOX PTE. LTD.*, SGP Business,

https://www.sgpbusiness.com/company/Sfox-Pte-Ltd [https://perma.cc/88AG-2MS9].  It

is unclear when or if SFOX BVI was incorporated, but the Terms of Service agreement

details that customers of SFOX BVI are governed by the laws of the British Virgin Islands.  *See* SFOX  Terms of Service § 5.8.

66.    SFOX operates an advanced trading platform for trading professionals, investors, and institutions to exchange cryptocurrency.  SFOX users can open accounts to buy and sell cryptocurrencies, review industry analytics and reports, monitor market prices and conditions, and more.  *See* Complaint for Conversion and Unjust Enrichment, *Ox Labs Inc. v. Bitpay, Inc.*, No. 2:18-cv-05934-MWF-KS, ECF No. 1 (C.D. Cal. filed July 6, 2018).  SFOX operates through the website www.sfox.com.

67.    SFOX offers four trading platforms.  SFOX Pro is a platform for trading professionals and institutions to buy, sell, manage, and secure cryptocurrency globally with SFOX's advertised low fees, algorithmic trades, and advanced risk management.  *See* SFOX, *SFOX Pro*, https://www.sfox.com/pro/ [https://perma.cc/VW58-HHAR].  SFOX Flash is a commission-free cryptocurrency trading platform that SFOX advertises as offering powerful trading using advanced technology to get the best price, instant trades, price and fee disclosures, and the ability to send, receive, deposit, and withdraw cryptocurrency and fiat currency.  *See* SFOX, *SFOX Flash*, https://www.sfox.com/flash/ [https://perma.cc/6WC9-6BW7].  SFOX Separately Managed Account Solution ("SFOX SMA") is a platform that provides customized investment portfolio management to wealth managers and investors to manage and trade on behalf of clients.  *See* SFOX, *SFOX SMA*, https://www.sfox.com/sma/ [https://perma.cc/XEQ4-G44K].  SFOX Dark Pool is a platform to trade large orders privately at competitive values in real-time.  *See*

SFOX, *SFOX Dark Pool*, https://www.sfox.com/darkpool/ [https://perma.cc/33CU-WGKK].

68.     SFOX has over 175,000 registered users who have undertaken more than $12 billion in transactions since 2015.  *See* SFOX, *SFOX Pro*, https://www.sfox.com/about/, https://www.sfox.com/pro/.  A Forbes article dated August 16, 2018 states,

> Sfox aims to provide a single point of access for institutional investors, like crypto hedge funds and family offices, that move large amounts of money.  Its platform plugs into digital currency exchanges and OTC desks . . . and tries to get the lowest price for buyers (and the highest price for sellers).  It does that by using a 'smart router' that scans the different trading venues for prices and tries to lock in the best deals . . . .  To make money, Sfox charges transaction fees, which range from 0.25% to 0.75%, depending on the type of order.  Over the past 12 months, it processed $5.4 billion in trades and brought in an estimated $15 million in revenue.

*See* Jeff Kauflin, *Startup Raises $23 Million to Make Crypto Trades Faster and Stealthier*, Forbes (Aug. 16, 2018), https://www.forbes.com/sites/jeffkauflin/2018/08/16/startup-raises-23-million-to-make-crypto-trades-faster-and-stealthier/ [https://perma.cc/UNZ9-J8YB].

69.     Although SFOX is headquartered in the United States, it operates globally, and its Terms of Service state that it "may restrict or prohibit use of all or a portion of [its] Services from certain countries, states, territories, or jurisdictions," including any country to which the United States has embargoed goods or services.  *See* SFOX Terms of Service § 1.2.

70.     SFOX users (who can be individuals or entities) enter into a legal agreement with SFOX.  SFOX's Terms of Service state:

> By signing up to use an account through sfox.com or any associated websites, APIs,[5] or mobile applications (the "<u>SFOX Site</u>") or by using the SFOX Site, you agree that you have read, understood, and accept all of the terms and conditions contained in this Agreement. If you do not agree to any part of the Agreement, you may not use the SFOX Site or the Services (as defined below).

71.     SFOX registered with FinCEN on January 31, 2018, as a money services business ("MSB") as required by 31 C.F.R. § 1022.380.  *See* **Exhibit 1**.  As an MSB, SFOX is required by the Bank Secrecy Act to conduct basic customer risk assessments to determine the level of risk associated with the account and whether further due diligence is necessary.  *See* 31 U.S.C. § 5311; 31 C.F.R §§ 1010.100(ff)(5), 1022.210; FinCEN Advisory No. FIN-2019-A003.

72.     Each MSB is required to retain the records described below with respect to any transmittal of funds in the amount of $3,000 or more.  *See* 31 C.F.R §§ 1010.100(ff)(5), 1010.410(e), 1022.210.  Such records are required to be retained by the MSB for 5 years.  *Id.* §1010.430(d).

73.     If the sender of the funds is an established customer of the MSB, the MSB must retain the following information:

- Name and address of the transmitter;

---

[5] An application programming interface ("API") connects computers or computer programs to one another.  *See* Wikipedia, *API*, https://en.wikipedia.org/wiki/API [https://perma.cc/39KR-6GDD].

- Amount of the transmittal order;

- Execution date of the transmittal order;

- Any payment instructions received from the transmitter;

- The identity of the recipient's financial institution;

- As many of the following items as are received with the transmittal order:

    (i) name and address of the recipient, (ii) the account number of the recipient, and (iii) any other specific identifier of the recipient; and

- Any form relating to the transmittal of funds that is completed or signed by the person placing the transmittal order.

*Id.* § 1010.410(e)(1)(i).

74.    If the sender of the funds is not an established customer of the MSB, the MSB must retain all the information specified in the preceding paragraph, plus:

- The type and number of the identification documents reviewed to verify the transmitter's identity, such as a driver's license, social security number or other tax identification number, or a passport or alien identification number; and

- A copy or record of the transmitter's method of payment.

*Id.* § 1010.410(e)(2).

75.    If the recipient of the funds is an established customer of the MSB, the MSB must retain an original, microfilm, other copy, or electronic record of the transmittal order.  *Id.* § 1010.410(e)(1)(iii).

76.    If the recipient of the funds is not an established customer of the MSB, the MSB must retain the following information, in addition to the information described in paragraphs 74 and 75 above:

- An original, microfilm, other copy, or electronic record of the transmittal order;

- If the MSB knows that the person receiving the proceeds is not the ultimate recipient, the ultimate recipient's name, address, and taxpayer identification number, alien identification number, or passport number (along with the country of issuance); and

- If the proceeds are delivered other than in person, a copy of the check or other instrument used to pay the transmittal, or the information contained on the check or other instrument, as well as the name and address of the person to whom it was sent.

*Id.* § 1010.410(e)(3).

77.     In addition, each MSB must develop, implement, and maintain an effective anti-money laundering program.  *Id.* § 1022.210(a).  At a minimum, the program must include provisions for verifying customer identification, filing reports, creating and retaining records, and responding to law enforcement requests.  *Id.* § 1022.210(d)(1)(i).

**B.     Business Operations**

78.     SFOX has described itself as a prime dealer with cryptocurrency services that gives its users a "better way to trade digital currencies [so that the users can get] the best price and deepest liquidity with a single point of access to global cryptocurrency markets."  SFOX, http://web.archive.org/web/20200412053528/https://www.sfox.com/ [https://perma.cc/4GTT-GCLP].

79.     SFOX users include retail customers, high net-worth individuals, family offices, funds, and sophisticated traders.  *See Untold Stories with Charlie Shrem, SFOX Exec Danny Kim Describes Bitcoin OTC, Custody, and How Institutions Will Enter Crypto*, at 29:45, YouTube (Oct. 22, 2019),

https://www.youtube.com/watch?v=VKEyCWR-

r4E&list=PLvER9nHSRN3xyQdrUAXKIgZ_hxeLI-kzy&index=28&t=0s ("Untold

Stories") [https://perma.cc/589P-6MYW].

80.     As of August 4, 2021, cryptocurrencies traded on SFOX include Bitcoin

("BTC"), ETH, LTC, Bitcoin Cash ("BCH"), Ethereum Classic ("ETC"), Bitcoin SV

("BSV"), Ravencoin ("RVN"), Basic Attention Token ("BAT"), Chainlink ("LINK"),

Paxos Standard ("PAX"), Binance USD ("BUSD"), PAX Gold ("PAXG"), Compound

("COMP"), Dai ("DAI"), USD Coin ("USDC"), Dogecoin ("DOGE"), Tether ("USDT"),

and 0x ("ZRX").  *See Available Cryptocurrency Markets on SFOX*, SFOX,

https://www.sfox.com/cryptocurrency-markets/ [https://perma.cc/8NS8-59MW].

81.     Among the cryptocurrency exchanges accessible on SFOX are Gemini,

Bitstamp, itBit Trust Company LLC, Kraken, and Bitfinex. *See* SFOX,

http://web.archive.org/web/20200412053528/https://www.sfox.com/

[https://perma.cc/4GTT-GCLP] (containing graphic showing SFOX's connection to these

exchanges).

82.     SFOX performs the processes described in paragraphs 72 to 77 above as the

direct counterparty to the SFOX user.  *See Untold Stories* at 12:41.

https://www.youtube.com/watch?v=VKEyCWR-

r4E&list=PLvER9nHSRN3xyQdrUAXKIgZ_hxeLI-kzy&index=28&t=0s

[https://perma.cc/589P-6MYW].

83.     To use SFOX, a user creates an account by accessing SFOX's website at www.sfox.com and clicking the "Try SFOX" button in the upper-right corner.  From there, the user is asked to provide a name, an email address, a phone number, a date of birth (if an individual), to create a password, and to agree to SFOX's Terms of Service. *See* SFOX, *Sign Up*, https://trade.sfox.com/signup [https://perma.cc/4NZ5-XYVS].  For a business account, a user must provide all the same information required for a personal account, excluding the date of birth, as well as the business name.  *See Sign Up – Business*, SFOX, https://trade.sfox.com/signup?type=business [https://perma.cc/LNK4-LXBD].

84.     To be eligible to register for a SFOX account and use SFOX services, a user must be at least 18 years old and meet the requirements listed in section 1.2. (Eligibility) of its Terms of Service.  By accessing or using SFOX services, users consent to "the processing and transfer of information in and to the applicable countries."  SFOX Terms of Service § 2.2.

85.     In addition, Section 2.3. (Fraud Prevention and Identity Verification) of the Terms of Service details that users "may be required to provide SFOX with certain personal information, including, but not limited to, your name, address, telephone number, e-mail address, date of birth, taxpayer identification number, government identification number, and information regarding your bank account (e.g., financial institution, account type, routing number, and account number)."  The user agrees to update SFOX if any of the information changes.  The user also authorizes SFOX to make

inquiries to verify the user's identity and to query account information associated with the user's linked bank account.  The user further authorizes their wireless operator to disclose their "mobile number, name, address, email, network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI) and other subscriber details."  *Id.*

86.     SFOX's Privacy Policy states: "The types of information we may collect include your name, email address, postal address, phone number, fax number, credit card information, bank information, identity information, Social Security number, date of birth, crypto currency address and any other information you choose to provide."  In addition, when a user accesses or uses SFOX services, SFOX will automatically collect "log information" (such as the type of browser the user employs, access times, pages viewed, and the user's internet protocol ("IP") address), device information, transaction information, location information, and information collected by cookies or other tracking technologies.  SFOX may also collect information from third parties, including identity verification services, credit bureaus, mailing list providers, and publicly available sources.  *See* SFOX, *SFOX Privacy Policy*, https://www.sfox.com/privacy/ [https://perma.cc/76AS-EGPK].

87.     SFOX users may sell cryptocurrency by linking a valid payment method.  A user authorizes SFOX to debit its SFOX account(s) and initiate payment to the payment method(s) in settlement of the user's sell transactions with the applicable trading fee,

which will vary depending on the algorithm selected to execute the transaction.  *See* SFOX Terms of Service § 3.2.

88.     SFOX users may purchase cryptocurrency by linking a valid payment method or depositing cryptocurrency.  A user authorizes SFOX to initiate debits from its selected payment method(s) or cryptocurrency balance in the settlement of the purchases with the applicable trading fee, which will vary depending on the algorithm selected to execute the transaction.  Users may have their funds debited before the cryptocurrency is delivered to the SFOX account.  *See id* § 3.1.  Users grant SFOX "a lien on and security interest in and to the balances in [the user's] account."  *Id.*

89.     SFOX's Terms of Service state that it "does not engage in or provide money transmission or money transfer or payment services."  *Id.* § 1.9.  All payments from SFOX's services are processed and disbursed by regulated financial institutions.  *See id*.

90.     In addition, Section 3.5 (Taxes) of the Terms of Service agreement states

It is your sole responsibility to determine whether, and to what extent, any taxes apply to any transactions you conduct through the Services, and to withhold, collect, report and remit the correct amounts of taxes to the appropriate tax authorities. SFOX does not deduct any amount for taxes when you enter into a transaction, and you are solely responsible for all tax returns and payments required to be filed with or made to any federal, state, or local tax authority in any nation with respect to any such transaction.

91.     SFOX's blog, consists of articles on various SFOX-related topics and other general virtual currency information.  *See SFOX Edge,* https://www.sfox.com/blog/ [https://perma.cc/A263-XA8T].  In at least two blog posts, SFOX described its wallet services.  Specifically, the blog explains that "SFOX provides an institutional and

34

professional wallet for LTC, as well as other leading cryptocurrencies. SFOX's wallet features multi-user functionality, 2FA/U2F[6] support, and unified reporting." **Exhibit 2** (emphasis omitted).  The blog further asserts that "SFOX provides an institutional-grade wallet for Bitcoin SV, along with other digital assets." **Exhibit 3**.  SFOX also advertises wallet services on its website homepage and directs users to its SFOX Pro platform to learn more about SFOX's cryptocurrency wallet and custody technology.  *See* SFOX, http://web.archive.org/web/20200412053528/https://www.sfox.com/ [https://perma.cc/4GTT-GCLP].

### C.   Tax Compliance Concerns Related to SFOX Users

92.   Information available to the IRS indicates that there were at least ten persons that engaged in transactions involving SFOX and failed to comply with their tax reporting obligations for such transactions.  The transaction amounts ranged from approximately $5,000.00 to $1 million.

93.   Taxpayer 1 is a U.S. citizen.  From 2016 through 2018, Taxpayer 1, personally and through a wholly owned limited liability company ("LLC 1"), was allegedly involved in the Bitconnect Ponzi scheme.[7]  As part of the alleged scheme, bank

---

[6] Universal 2nd Factor ("U2F") is a security technology standard that aims to strengthen and simplify two-factor authentication ("2FA").  *See* Wikipedia, *Universal 2nd Factor*, https://en.wikipedia.org/wiki/Universal_2nd_Factor [https://perma.cc/PRY6-7MQ3].

[7] Bitconnect operated a cryptocurrency lending and exchange program.  It grew to hold a market capitalization of over $2.5 billion, and it guaranteed investors up to a ten percent total return per month, following a tiered-investment system based on the investor's initial deposit.  *See* FBI, Press Release, *Seeking Potential Victims in Bitconnect*

accounts held in the name of Taxpayer 1 and LLC 1 were used to receive and transfer funds.  Taxpayer 1 and LLC 1 received approximately $1 million from various third party-merchants, digital currency exchanges, and SFOX.  Taxpayer 1 reported income on a 2016 tax return stemming primarily from IRS Form W-2 wages and reported income on 2017 and 2018 tax returns stemming primarily from Form W-2 wages and from LLC 1, which was reported on Schedule C (Profit or Loss from Business).  Although Taxpayer 1 reported approximate Schedule C gross receipts of $0, $650,000, and $125,000 in 2016, 2017, and 2018, respectively, those reported amounts are significantly less than the approximately $1 million of known deposits during the same period.  Furthermore, Taxpayer 1 did not report any gain or loss from virtual currency transactions on a Schedule C or any other schedule or form on the 2016, 2017, or 2018 tax returns.  As described in Section I.C., above, the sale or exchange of cryptocurrency and the receipt of cryptocurrency as compensation are taxable events.  Based on my experience as a Senior

---

*Investigation*, (Feb. 20, 2019), https://www.fbi.gov/contact-us/field-offices/cleveland/news/press-releases/seeking-potential-victims-in-bitconnect-investigation [https://perma.cc/C2AC-ASKV].  According to information available to the IRS, Bitconnect enlisted multi-level affiliate marketers to recruit new investors, and Taxpayer 1 was a prominent Bitconnect recruiter.  After the States of North Carolina and Texas issued public letters warning that Bitconnect was engaging in an unregistered sale of securities, in January 2018, Bitconnect suddenly shut down its trading platform and lending program, which led to a 90% drop in the value of Bitconnect's investors' holdings.  *See* Yogita Khatri, *FBI Seeking Potential Victims of BitConnect to Assist Investigation*, Coindesk (Feb. 22, 2019), https://www.coindesk.com/fbi-seeking-potential-victims-of-bitconnect-to-assist-investigation [https://perma.cc/2PNX-U74W]; https://www.fbi.gov/contact-us/field-offices/cleveland/news/press-releases/seeking-potential-victims-in-bitconnect-investigation [https://perma.cc/C2AC-ASKV].

Revenue Agent, Taxpayer 1's receipt of U.S. dollars from digital currency exchanges and SFOX is indicative of taxable transactions, likely reflecting the sale of cryptocurrency or the receipt of cryptocurrency as compensation and should have been reported on a Schedule C or some other schedule or form.  Although Taxpayer 1 reported some income on a Schedule C, there was no report of gain or loss from virtual currency transactions and the gross receipts amounts reported do not appear to include the known deposits.

94.     Taxpayer 2 is a U.S. citizen.  Taxpayer 2 is a YouTube video creator and online gambler who receives cryptocurrency deposits from YouTube subscribers and gambling.  In addition, Taxpayer 2 receives gambling returns in cryptocurrency that are sold via third-party platforms.  In 2018 and 2019, Taxpayer 2 made cryptocurrency deposits of approximately $120,000 into an SFOX account.  The deposited cryptocurrency was immediately exchanged into U.S. dollars and transferred from the SFOX account to a bank account.  Taxpayer 2 answered "Yes" to the 2019 Schedule 1 question, "At any time during 2019, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency during the year?"  As discussed in Section I.C. above, receipt of cryptocurrency as compensation and the exchange of cryptocurrency into U.S. dollars are taxable events.  Despite this, Taxpayer 2 failed to report any gain or loss from any cryptocurrency transactions, including the sales conducted through SFOX, on a Schedule D (Capital Gains or Losses) or any other schedule or form on the 2018 and 2019 tax returns.  Taxpayer 2 should have reported the specific cryptocurrency unit, date, basis, and proceeds from each disposition of

cryptocurrency on a Schedule D or some other schedule or form.  Although the value of the cryptocurrency was approximately $120,000 at the time it was deposited into the SFOX account, that is not Taxpayer 2's basis in the property or purposes of determining gain or loss.  *See* paragraph 38, *supra*.  Based on my experience as a Senior Revenue Agent, the transactions in which Taxpayer 2 engaged with SFOX are indicative of taxable income,  however, Taxpayer 2 has not filed any tax returns reporting income from this activity.

95.     Taxpayer 3 is a U.S. citizen.  In 2018, Taxpayer 3 deposited approximately 20 units of Bitcoin into several SFOX accounts.  At the time of the deposits, the Bitcoin was worth approximately $120,000.  On the same day the Bitcoin was deposited, it was exchanged for U.S. dollars and transferred from SFOX to Taxpayer 3's personal bank account.  In total, Taxpayer 3 transferred approximately $115,000 from SFOX to the personal bank account.  The income reported on Taxpayer 3's 2018 tax return stems from Schedule C income, and the amount reported on the Schedule C is significantly less than the exchanged Bitcoin at issue.  In addition, Taxpayer 3 failed to report any gain or loss from any cryptocurrency transactions, including the sales conducted with SFOX, on a Schedule D or any other schedule or form on the 2018 tax returns.  As discussed in Section I.C. above, the exchange of cryptocurrency into U.S. dollars is a taxable event.  Taxpayer 3 should have reported the specific Bitcoin unit, date, basis, and proceeds from each disposition on a Schedule D or some other schedule or form.  Although, the value of the Bitcoin was approximately $120,000 at the time it was deposited into the SFOX

account, like Taxpayer 2, the value on the date of the transfer is not the basis of the cryptocurrency in the hands of Taxpayer 3 for purposes of determining gain or loss. Based on my experience as a Senior Revenue Agent, the Bitcoin transactions in which Taxpayer 3 engaged with SFOX are indicative of taxable income and it appears that Taxpayer 3 has underreported income by failing to properly report those transactions.

96.     Taxpayer 4 is a U.S. person.  In 2018 and 2019, Taxpayer 4 deposited approximately 15 total units of Bitcoin into an SFOX account.  At the time of the deposits, the Bitcoin was worth approximately $60,000.  On the same days the Bitcoin were deposited with SFOX, Taxpayer 4 exchanged the Bitcoin into U.S. dollars and transferred the proceeds into a personal bank account.  In total, Taxpayer 4 transferred approximately $55,000 from SFOX to the bank account.  Taxpayer 4 did not file a federal tax return for 2018.  Taxpayer 4 did file a 2019 tax return that reported only one dollar of taxable interest income but did not report any gain or loss from any virtual currency transactions on any schedule or form.  As discussed in Section I.C. above, the exchange of cryptocurrency into U.S. dollars is a taxable event.  Taxpayer 4 should have reported the specific Bitcoin unit, date, basis, and proceeds from each disposition on a Schedule D or some other schedule or form.  Like in the prior examples, Taxpayer 4's basis in the cryptocurrency for purposes of determining gain or loss is not the approximate $60,000 value at the time it was deposited into the SFOX account.  Based on my experience as a Senior Revenue Agent, the transactions in which Taxpayer 4 engaged with SFOX are

indicative of taxable income, however, Taxpayer 4 has not filed any tax returns reporting income from this activity.

97.     Taxpayer 5 is a U.S. citizen.  Between October 2018 and March 2019, Taxpayer 5 received Automated Clearing House ("ACH") (*i.e.*, electronic) and cash deposits of approximately $55,000 into a personal bank account from various third parties.  Approximately $7,000 of such deposits were received from SFOX.  Taxpayer 5 subsequently withdrew approximately $30,000 of the deposits in 47 separate cash withdrawals.  Taxpayer 5's 2018 and 2019 tax returns reported income stemming primarily from wages reported on Forms W-2.  Taxpayer 5's 2018 and 2019 tax returns did not report any income from the transactions described above or any other virtual currency on any schedule or form.  As described in Section I.C. above, the receipt of cryptocurrency as compensation or the sale or exchange of cryptocurrency are taxable events.  Taxpayer 5 should have reflected the receipt of these transfers as wages, other income, or capital dispositions on the 2018 and 2019 tax returns.  Based on my experience as a Senior Revenue Agent, the transactions in which Taxpayer 5 engaged, including the receipt of funds disbursed from SFOX, are indicative of taxable income. Because these transfers of U.S. dollars cannot be accounted for on the 2018 and 2019 tax returns, it appears that Taxpayer 5 has underreported income.

98.     Taxpayer 6 is a U.S. citizen.  In 2017 and 2018, Taxpayer 6 received ACH deposits into a personal bank account of approximately $30,000 from various third parties, including SFOX and a digital currency exchange.  During the same period,

Taxpayer 6 deposited approximately $20,000 in cash and checks from unknown sources into the same bank account. Taxpayer 6 subsequently withdrew approximately $45,000 of the deposited funds, primarily in cash or through point-of-sale transactions. Taxpayer 6's 2017 and 2018 tax returns only reported income stemming from wages reported on Forms W-2. As described in Section I.C. above, the sale or exchange of cryptocurrency or the receipt of cryptocurrency as compensation are taxable events. Taxpayer 6 should have reflected the receipt of these transfers as wages, other income, or capital dispositions on the 2017 and 2018 tax returns. Based on my experience as a Senior Revenue Agent, the transactions in which Taxpayer 6 engaged, including the receipt of funds disbursed from SFOX, are indicative of taxable income. Because these transfers of U.S. dollars cannot be accounted for on the 2017 and 2018 tax returns, it appears that Taxpayer 6 has underreported income.

99.     Taxpayer 7 is a U.S. citizen. Taxpayer 7 made cryptocurrency deposits into two SFOX accounts of approximately $20,000 and $60,000 in 2018 and 2019, respectively. The deposited cryptocurrency was exchanged into U.S. dollars and subsequently transferred out of the SFOX accounts to a bank account. As discussed in Section I.C. above, the exchange of cryptocurrency into U.S. dollars is a taxable event. Yet, on a 2018 tax return Taxpayer 7 only reported income stemming from Form W-2 wages and interest and failed to report any gain or loss from the sales of cryptocurrency, including the sales conducted through SFOX. On the 2019 tax return, Taxpayer 7 reported Bitcoin sales of approximately $10,000 on Schedule D and Form 8949 (Sales

and Other Dispositions of Capital Assets).  However, this reported amount is far less than the approximately $60,000 of known sales conducted through SFOX in 2019.  Although, the value of the cryptocurrency was approximately $20,000 and $60,000 at the time of the deposits into the SFOX account, the value on the dates of the deposits is not the basis of the cryptocurrency in the hands of Taxpayer 7 for purposes of determining gain or loss.  Based on my experience as a Senior Revenue Agent, the transactions in which Taxpayer 7 engaged are indicative of taxable income and Taxpayer 7 should have reported the specific cryptocurrency unit, date, basis, and proceeds from each disposition of cryptocurrency on a Schedule D or some other schedule or form in 2018 and to have fully accounted for the cryptocurrency dispositions in 2019.  By failing to properly report those transactions, it appears that Taxpayer 7 has underreported income.

100.   Taxpayer 8 is a U.S. citizen.  In November 2018, Taxpayer 8 deposited approximately $5,000 of cryptocurrency into an SFOX account.  On the same day the cryptocurrency was deposited, it was exchanged for U.S. dollars and the proceeds transferred from SFOX to Taxpayer 8's personal bank account.  As discussed in Section I.C. above, the exchange of cryptocurrency into U.S. dollars is a taxable event.  Taxpayer 8's 2018 tax return only reported income stemming from Form W-2 wages and did not report any gain or loss from virtual currency transactions on any schedule or form including the sales conducted through SFOX.  Taxpayer 8 should have reported the specific cryptocurrency unit, date, basis, and proceeds from the disposition of each cryptocurrency on a Schedule D or some other schedule or form on the 2018 tax return.

Again, although the value of the cryptocurrency was approximately $5,000 at the time it was deposited into the SFOX account, the value on the date of the transfer is not the basis of the cryptocurrency in the hands of Taxpayer 8 for purposes of determining gain or loss.  However, because Taxpayer 8 has failed to properly report the cryptocurrency transactions with SFOX on the 2018 tax return, it appears that Taxpayer 8 has underreported income.

101.   Taxpayer 9 is a U.S. citizen.  In June 2018, Taxpayer 9 deposited approximately 2 units of Bitcoin into an SFOX account.  At the time of the deposits, the Bitcoin was worth approximately $10,000.  On the same day it was deposited the Bitcoin was exchanged for U.S. dollars and the proceeds transferred from SFOX to Taxpayer 9's personal bank account.  As discussed in Section I.C. above, the exchange of cryptocurrency into U.S. dollars is a taxable event.  Taxpayer 9 should have reported the specific Bitcoin unit, date, basis, and proceeds from the disposition the Bitcoin on a Schedule D or some other schedule or form.  Taxpayer 9's 2018 tax return only reported income stemming from Form W-2 wages, Individual Retirement Accounts ("IRAs")/pensions/annuities, and unemployment income.  Taxpayer 9 failed to report any gain or loss from the sales of cryptocurrency, including the sales conducted with SFOX, on the 2018 tax return.  Although the value of the Bitcoin was approximately $10,000 at the time it was deposited into the SFOX account, the value on the date of the transfer is not the basis of the cryptocurrency in the hands of Taxpayer 9 for purposes of determining gain or loss.  Based on my experience as a Senior Revenue Agent, the

transactions in which Taxpayer 9 engaged with SFOX are indicative of taxable income, however, Taxpayer 9 has not filed any tax return reporting income from this activity.

102.   Taxpayer 10 is a U.S. person.  Between October 2018 and January 2019, Taxpayer 10's personal bank account was funded with approximately $5,000 in ACH deposits from several digital currency exchanges, including approximately $4,000 received from SFOX that appear to be proceeds from the exchange of cryptocurrency, as well as with cash deposits totaling approximately $10,000.  During the same period, the same bank account also had 62 transfers, totaling approximately $5,000, to a digital currency exchange and approximately $5,000 of internet and point of sale/debit card purchases.  Taxpayer 10's 2018 and 2019 tax returns only reported income stemming from Form W-2 wages, IRAs/pensions/annuities, and social security benefits.  Such returns did not report any income from the above referenced transactions or any gain or loss from virtual currency transactions on any schedule or form.  As described in Section I.C. above, the receipt of cryptocurrency as compensation or the sale or exchange of cryptocurrency are taxable events.  Taxpayer 10 should have reflected the receipt of these transfers as wages, other income, or capital dispositions on the 2018 or 2019 tax returns. Based on my experience as a Senior Revenue Agent, the transactions in which Taxpayer 10 engaged, including the receipt of funds disbursed from SFOX, are indicative of taxable income.  Because these transfers of U.S. dollars cannot be accounted for on the 2018 and 2019 tax returns, it appears that Taxpayer 10 has underreported income.

## III.   THE "JOHN DOE" SUMMONS REQUIREMENTS ARE MET

103.   As described in greater detail below: (A) the "John Doe" summons to SFOX relates to the investigation of an ascertainable group or class of persons; (B) there is a reasonable basis for believing that such group or class of persons has failed or may have failed to comply with provisions of the internal revenue laws; and (C) the information and documents (and the identity of the persons with respect to whose tax liabilities the summonses have been issued) sought to be obtained from the examination of the records or testimony are not readily available from sources other than SFOX.

### A.   The Summons Describes a Particular Person or Ascertainable Class of Persons

104.   The proposed John Doe summons to SFOX seeks information regarding unknown U.S. taxpayers who directly or indirectly held or had control over any combination of user accounts at SFOX with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year during the period January 1, 2016, through December 31, 2021.

### B.   There Is a Reasonable Basis to Believe that Members of the John Doe Class May Have Failed to Comply with the Internal Revenue Laws

105.   As explained above, cryptocurrency, along with other virtual currencies, is treated as property under the internal revenue laws.  The receipt and disposition of cryptocurrency may give rise to federal tax liabilities.  As detailed in this declaration, the IRS is aware of numerous situations in which owners of cryptocurrency have failed to comply with internal revenue laws as they relate to cryptocurrency transactions.

106.   In my investigation, I was able to identify specific individuals, discussed in paragraphs 93-102 above, who held accounts with SFOX and may have failed to comply with their tax reporting requirements.

107.   The information available to the IRS and its experience with other compliance initiatives suggest that many unknown U.S. taxpayers engage in virtual currency transactions.  Because the IRS does not know the identity of the individuals within the John Doe class, it cannot yet examine the income tax returns filed by those taxpayers to determine whether they have properly reported any income attributable to virtual currencies.

108.   Taken as a whole, the information obtained by the IRS and discussed in this declaration indicates that members of the John Doe class may have failed to properly report their cryptocurrency transactions or failed to report the associated income and pay the proper amount of tax.

**C.     The Requested Materials (and the Identities of the Members of the John Doe Class) Are Not Readily Available from Other Sources**

109.   Concurrently with the filing of this petition, the IRS is filing a petition in the U.S. District Court for the Southern District of New York seeking leave to serve a John Doe summons on M.Y. Safra Bank, FSB ("M.Y. Safra").

110.   M.Y. Safra is a bank that was established on June 5, 2000.  It has been insured with the Federal Deposit Insurance Corporation ("FDIC") since that date.  *See* FDIC, *M.Y. Safra Bank, FSB* (Nov. 12, 2021), https://banks.data.fdic.gov/bankfind-

suite/bankfind/details/35154?activeStatus=0%20OR%201&bankfindLevelThreeView=History&branchOffices=true&name=M.Y.%20SAFRA%20BANK%2C%20FSB&pageNumber=1&resultLimit=25 [https://perma.cc/E85P-VS7R].  According to "About Us" section of its webpage, M.Y. Safra serves as a "full-service banking institution for clients worldwide."  *See About Us*, M.Y. Safra, https://www.mysafra.com/About [https://perma.cc/9TSW-NF27].  It has options for personal, private, business, and FinTech banking, including checking accounts, savings accounts, certificates of deposit, mortgage loans, cash management services, and business loans.

111.   In 2019, M.Y. Safra and SFOX partnered to offer SFOX's traders cash deposit accounts at M.Y. Safra.  *See* Matthew Leising, *Wild Crypto Market's Traders Get Something New: FDIC Protection*, Bloomberg (May 14, 2019), https://www.bloombergquint.com/business/wild-crypto-market-s-traders-get-something-new-fdic-protection [https://perma.cc/S4H6-VRSF].

112.   According to SFOX's Terms of Service dated May 31, 2019 (a copy of which are attached hereto as **Exhibit 4**), approved users were "offered the ability to receive certain services from" M.Y. Safra.  *Id.* § 2.4.  The Terms of Service included an appendix containing particular terms associated with the M.Y. Safra which included the following:

> Certain approved and properly onboarded Clients will hold an interest in a pooled account with M.Y. Safra to the extent of the funds Client holds in such account (the 'Pooled Account'). Client is the owner of its share of the balance of the Legal Tender in the Pooled Account and SFOX has no right, title or interest in, access or control over, the Pooled Account or the funds in the

Pooled Account. . . . Certain qualified Clients will also enter into standard commercial account documentation with M.Y. Safra and SFOX will arrange for such Clients to sign and deliver all such documentation to M.Y. Safra. Such Clients will hold commercial transaction accounts ('Commercial Accounts') with M.Y. Safra.

*Id.* Appendix 2, § 1.1.

113.   When an SFOX user with an interest in a M.Y. Safra account initiated a transfer of funds in connection with the purchase or sale of cryptocurrency, the user provides its instructions to SFOX, which then processes those instructions to M.Y. Safra. M.Y. Safra would then make a transfer of funds from the account (either the Pooled Account or the SFOX user's Commercial Account) to an operating account maintained by M.Y. Safra for SFOX.  *See id.* § 1.7.

114.   Any customer service issues related to the M.Y. Safra account are directed to SFOX by the user.

115.   SFOX's Terms of Service were updated on November 18, 2019, and no longer made mention of M.Y. Safra.  *See* **Exhibit 5**.  SFOX's most recent terms of service, updated in November 2021, do not mention M.Y. Safra.  *See* SFOX Terms of Service.

116.   Based on information in the IRS's possession and because of the account services M.Y. Safra offers its users, I believe that SFOX and M.Y. Safra may possess related, but qualitatively different, user and transaction information.  As a financial institution, M.Y. Safra performed additional KYC protocols while onboarding SFOX users and holds banking records such as wires, transfers, and transaction reports.  Further,

as discussed above, the IRS has learned that cryptocurrency entities may not always possess all the information needed to positively identify their customers.  Accordingly, the John Doe summonses for SFOX and M.Y. Safra make distinct requests that reflect the information I believe each separate entity should possess.

117.   To my knowledge, and based on my experience, SFOX is the only repository of the information sought in the requests included in the attachment to the summons.  To the extent that there are U.S. taxpayers who are SFOX users, and whose identities are known to the IRS at the time the summons is issued, such U.S. taxpayers/SFOX users will be identified for the summoned party and excluded from the John Doe class.

118.   The records sought by the John Doe summons are not otherwise reasonably and timely available to the IRS.

**D.     The Information Sought Is Narrowly Tailored to Information that Pertains to the Failure or Potential Failure of Members of the John Doe Class to Comply with the Internal Revenue Laws**

119.   Additionally, the information sought in the summons is narrowly tailored to seek only information that is necessary for the IRS to identify and investigate whether individuals in the John Doe class complied with the internal revenue laws with respect to their cryptocurrency activity.

120.   The proposed SFOX summons, attached as **Exhibit 6**, seeks records that may reveal the identity and transaction activity of unknown SFOX users, who had control over any combination of SFOX accounts with at least the equivalent of $20,000 in value

of transactions (regardless of type) in cryptocurrency in any one year from January 1, 2016, through December 31, 2021.

121.   The information requested is narrowly tailored to assist the IRS with identifying and beginning to investigate U.S. taxpayers with accounts at SFOX that have potentially failed to comply with the internal revenue laws.  The requests are directed at two categories: user identity information and transaction activity.

122.   Requests one, two, and five are directed at adequately identifying the John Doe class members so that transactional data can reasonably be associated with a particular person.  Unlike traditional financial accounts, SFOX accounts can be opened with limited personal-identifying information and without signature cards or written account applications.  As a result, linking a particular account to an actual person for purposes of examining such taxpayer's compliance with the internal revenue laws requires access to whatever identifying information SFOX obtained from the user during the opening of the account or during its subsequent interactions.

123.   Requests three and four are directed at obtaining transactional information that may permit the IRS to evaluate whether a particular taxpayer complied fully with internal revenue laws.

124.   The IRS expects the summoned records will produce leads to help it identify U.S. taxpayers that have transacted in cryptocurrency at or above the transaction threshold ($20,000) through SFOX at any time during the specified period and who may

have failed to comply with internal revenue laws with respect to reporting those transactions.

125.   Addressing the requests specifically, request 1 seeks account registration records for each SFOX account owned or controlled by a user.  The IRS is asking for accounts owned *or* controlled by the user because it is not uncommon for individuals to disguise account ownership through a nominee or an alias.

126.   The IRS identified specific items within the account registration records that it needs: (1) complete user profile, account application information, and user preferences; (2) history of changes to the user profile; (3) complete user history; and (4) complete user payment methods, including any other information relating to funding sources.  The IRS is not seeking private personal information such as password, pins, private keys, security settings, or account recovery information.

127.   Based on the IRS's experience when issuing any summons, including John Doe summonses, it has concluded that it needs to draft its requests for information in a manner that ensures it will capture the information that it needs even when it is not clear, as with SFOX, how the summoned party categorizes or defines that information. Therefore, the proposed summons specifically identifies the four types of information in paragraph 126.

128.   The IRS has identified "user profile," "user preferences," and "account application information" as three categories relied upon by entities to store or manage personal information that likely contains basic personal information about the user.  The

IRS's request for information within these categories is designed to ensure it receives identifying information regardless of what it is called or how it is stored.

129.   Cryptocurrency prime dealers do not maintain a particular "account application" document because information is generally entered by the applicant through a web-based portal with a series of data fields rather than a traditional "application" that would be completed on paper.

130.   The IRS does not know how SFOX categorizes its information, but to clarify, the IRS is seeking the following basic account user information:

- Name;
- Taxpayer identification number;
- Date of birth;
- Physical address;
- Telephone number; and
- Email address

131.   The IRS needs a user's telephone number and email address (in addition to a name, taxpayer identification number, date of birth, and physical address) as they have become a more fundamental aspect of a person's identity.  Based on my experience, telephone and email information is relied upon more heavily in the cryptocurrency space than names or physical addresses.

132.   The IRS's internal systems track a taxpayer's physical address, telephone number, and email address when reported by them when filing their income tax returns.

133.   In situations where the IRS does not receive a taxpayer identification number, or the person's name and taxpayer identification number do not initially match with the IRS's internal information, additional data points such as date of birth, physical address, telephone number, and email address can assist the IRS in linking the user account information to a specific taxpayer.

134.   Generally, the IRS tries to have three specific data points that match to positively link information to a taxpayer.  Being able to reconcile multiple different pieces of identifying information against the IRS's internal records is necessary when verifying an account user's identity.

135.   Based on SFOX's personal and business creation webpages, I believe that the information SFOX collects from its users will include a telephone number and email address.

136.   Internally, the IRS is also in possession of cryptocurrency platform data received from other sources relating to foreign-based cryptocurrency exchanges.  This data lacks a taxpayer identification number.  Because of how foreign-based cryptocurrency exchanges track user information, this data is best searched using telephone numbers, email addresses, and internet protocol addresses (discussed below).

137.   SFOX requires its users to update their information should any of it change. I expect that the user account information that is maintained in SFOX's records at the time SFOX responds to the summons may not reflect the name, date of birth, physical address, telephone number, or email address information that was provided when the

account was created and may not match what the IRS has in its databases because the information may have been changed.  The proposed summons requests a complete list of how this information may have changed to help the IRS successfully link a user's account information to an individual taxpayer.

138.   The proposed summons request for complete user history is directed specifically at internet protocol ("IP") addresses.  This information is helpful when initially confirming a user's identity and making an initial determination regarding whether the identified user is in tax compliance.

139.   In situations where the IRS has had difficulty adequately confirming a taxpayer's identity, it has been able to employ IP address information as an additional data point to confirm that the IRS has connected information to the proper taxpayer.  IP address information indicates the geographical location where a device accesses the internet (generally through an internet service provider).  The geographical location of an IP address is publicly available so the IRS can use IP address information to search publicly available records to determine a location.

140.   For example, a taxpayer accessing his SFOX account from Los Angeles, California will have an IP address indicating that the access was made from Los Angeles, California.

141.   Based on SFOX's privacy policy, it is my understanding that IP address information is actively being collected and monitored.

142.   Using this information, the IRS will be able to confirm a user's identity in situations where the user's identity is not certain based on the other personal information by confirming that the account was accessed from IP address locations that coincide with the taxpayer's known physical address.

143.   Conversely, where the IP address information does not match, the IRS will be able to conduct additional due diligence to determine the proper account owner or whether there was an incidence of identity theft.

144.   Aside from its utility in confirming an individual's identity, the IRS will be able to use this information to make a determination regarding a user's tax compliance. The IRS is in possession of data relating to foreign cryptocurrency exchanges.  That data lacks a taxpayer identification number, but does include information such as telephone number, email address, and IP address.  Being able to match the IP address information of an SFOX user to IP address information (and other data points contained in the IRS's information) will permit the IRS to link substantive transactional information from multiple sources for a single individual taxpayer and make a more accurate initial determination regarding that individual's tax compliance.

145.   In my experience as a Senior Revenue Agent, it is important for the IRS to receive this information at the same time it receives the other identity information because it helps identify users and can be searched against existing data in the IRS's possession to determine whether a user is in tax compliance.

146.   If the IRS only receives the "name" listed on the account, that name may be fictitious or belong to a fictitious entity, which would result in the IRS being unable to connect the nominal account name with an actual taxpayer.

147.   In the IRS's experience, user accounts can list a pseudonym rather than actual name information or can omit a name altogether.

148.   Based on its experience, the IRS has concerns about potential situations where user account information cannot be adequately linked to an actual taxpayer because of missing or incorrect information – particularly the lack of a taxpayer identification number.

149.   Because SFOX does not request taxpayer identification number information to create an account, it is expected that SFOX users may have used pseudonyms and other fictitious information.

150.    The IRS's experience in investigating tax evasion and avoidance indicates that when less identifying information is gathered, particularly a taxpayer identification number, the risk of individuals providing false or fictitious information is even greater and taxpayers who create false identities are more likely to evade their taxes.  This phenomenon is like the increased evasion of taxes that occurs when there is a lack of information return reporting.

151.   Request 2 seeks all exception reports produced by SFOX's anti-money laundering ("AML") system and all records of investigation of such exceptions.

152.   Exceptions reports are used to identify questionable user transactions that warrant additional research and investigation.  Based on my experience, reviewing these reports allows the IRS to leverage the industry expertise of the business involved (here, a cryptocurrency prime dealer) regarding activity it deems abnormal or suspicious and allows the IRS to combine that expertise with other information available to the IRS to help it determine whether the subject taxpayer is complying with the internal revenue laws.

153.   Moreover, investigative information compiled by the cryptocurrency prime dealer as part of its review of the exception report often contains information provided by users explaining the nature of the questionable activity.  That information can also assist the IRS in determining whether a taxpayer is complying with tax laws.

154.   For example, in response to an investigation regarding large dollar, voluminous, or frequent transactions, a user may provide an explanation regarding the source or destination of funds or the specific purpose for the activity that is reasonable and comports with what the user reported on a tax return.  In this situation, the IRS may be able to avoid unnecessarily examining an individual based on what may otherwise have appeared to be questionable activity.

155.   Request 3 seeks all records of activity in users' accounts.

156.   Based on my review of the type of activity permitted on SFOX's platform, I anticipate SFOX having the following transactional information which is necessary to determine whether users complied with the internal revenue laws.

157.   The IRS needs purchase and sale information for the subject user accounts. This includes transactions where cryptocurrency units were purchased or sold for fiat currencies or exchanged for other cryptocurrencies.  The sale of cryptocurrency for cash or exchange of cryptocurrency for other cryptocurrency is a taxable disposition.  The purchase of cryptocurrency is not inherently taxable, but the purchase price (plus any fees paid) establishes the cost basis in that property, which is used to determine the amount of taxable gain generated upon the sale of that same unit.  The same is also true in situations where cryptocurrency is exchanged for another cryptocurrency rather than fiat currency.

158.   These types of transactions are reportable on an individual's income tax return and relate directly to an individual's proper tax reporting.

159.   Where users engage in "margin" activity, that is the borrowing (or lending) of fiat currency or cryptocurrency to effectuate other trading activity, those transactions have tax implications.

160.   The IRS needs information relating to the deposit and withdrawal of cryptocurrency units out of each user's account.

161.   The IRS needs information relating to the incoming and outgoing transactions in each user's account.  The existence of such transactions indicates that a user is purchasing or selling cryptocurrency on the SFOX platform, but it may also indicate that a user is engaged in cryptocurrency transactions on other cryptocurrency platforms or moving cryptocurrency to personal user wallets.  The IRS needs to know this information to identify where each user is holding cryptocurrency so it can gather as

much information as possible to make a determination regarding whether users complied with the internal revenue laws.

162.   Additionally, the deposit or withdrawal of units from an account may be taxable transactions themselves.  The deposit (receipt) of cryptocurrency into an account may represent compensation or a similar payment to the user that represents taxable income.  Conversely, the withdrawal (sending) of units from the account may represent a taxable disposition if the units are going to a third-party.  Knowing the third-party (or counterparty's) name and user ID helps the IRS make a determination about whether the transaction is a taxable disposition to either the taxpayer or the third-party (provided the third-party is an SFOX user).

163.   In order to evaluate this information to determine the proper tax characterization of the transactions and whether a user is in tax compliance, the IRS needs this transactional information, including the date and time of the transaction, cryptocurrency involved, amount of cryptocurrency involved, U.S. dollar value, transaction hash (ID), and blockchain addresses and the counterparty's name and user ID.

164.   The IRS needs records relating to other taxable events that may have occurred within the account.  This includes the receipt of additional units of cryptocurrency as the result of a chainsplitting hard fork, which represents taxable income, or other situations where a user may receive units of cryptocurrency gratuitously through promotional events.

165.   Because all these situations may result in taxable income to the user, the IRS needs the transactional information relating to these events so it can properly determine whether each user is complying with the tax law.

166.   Request 4 seeks all records of account funding relating to the deposit, withdrawal, or transfer of fiat currency.  The IRS uses this information to understand how a user is funding his or her purchases of cryptocurrency and where money may be getting sent after units are sold.  This information is evaluated against other information in the IRS's possession and reported on the user's tax returns to make the most-informed decision the IRS can on whether an individual is in compliance with the internal revenue laws.

167.   Request 5 seeks information held by SFOX for each M.Y. Safra account that an SFOX user partially or completely owned, controlled, or held an interest in during the relevant periods.  Request 5 also seeks information held by SFOX for M.Y. Safra accounts owned, controlled, or administered by SFOX for users during the relevant periods.  Specifically, this request seeks user reference identification numbers; account agreements; and communications between SFOX and M.Y. Safra pertaining to the M.Y. Safra account and related transaction information or communications between SFOX and the user pertaining to the M.Y. Safra account and related transaction information.

168.   Information available to the IRS indicates that when funds are moved from the Pooled Account at M.Y. Safra (described *supra* ¶ 113), in which the SFOX user has an interest or from the SFOX user's commercial account to the operating account

maintained by M.Y. Safra for SFOX, the transactions are usually associated with a user reference identification number.  Because any transactions will be moved to an operating account maintained by M.Y. Safra on SFOX's behalf, the IRS needs to know the reference identification numbers associated with the user so that it can identify which users have transacted so that it can determine the individual's tax compliance.

169.   The account agreements and communications may reveal who is the originator or beneficiary of a transaction.  The information will also assist the IRS in understanding what transactions were authorized by the user.  The IRS uses this information to understand how a user is funding their purchases of cryptocurrency and where the money may be getting sent after units are sold.  This information is evaluated against other information in the IRS's possession and reported on the user's tax returns to make the most-informed decision the IRS can on whether an individual is in compliance with the internal revenue laws.

## III.   CONCLUSION

170.   Based upon the foregoing, I believe the information sought by the John Doe summons to SFOX will allow the IRS to identify U.S. persons who had control over any combination of SFOX accounts with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year from the years ended December 31, 2016, through December 31, 2021, who may have failed to comply with their obligation to report and pay tax on virtual currency transactions.

1     I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746 that the

2  foregoing is true and correct.

3

4     Executed this 20 day of July 2022, in San Francisco, California.

5

6

7     _____

8     SENG TCHONG LEE
      Senior Revenue Agent
      Internal Revenue Service
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28